May it please the Court, my name is Timothy Ballou and I'm representing Natural Resources Defense Council and the Sierra Club. I'll be addressing issues relating to the Department's selection of standards under the Energy Policy and Conservation Act. Mr. Ballou, would you bring the microphone just a little closer to your... Sorry. Yeah. And remember to speak up because we... Yeah, thanks. Sorry, Your Honor. Megan Acevedo of the California Attorney General's Office will follow and cover issues arising under the National Environmental Policy Act. We would each like to reserve three of our ten minutes for rebuttal if that proves possible. In the rulemaking under review, the Department of Energy was tasked with setting energy efficiency standards for electricity distribution transformers. Congress required these standards be set at the maximum technologically feasible levels that are economically justified. And the Department found that strong, technologically feasible standards would eliminate a significant waste of energy, avoiding the need to construct several new power plants and saving more than $10 billion for electric utilities and rate payers across the nation. However, DOE rejected these standards as not economically justified based on an analysis that was arbitrary and capricious and we are therefore seeking a remand of these standards with a deadline for action within one year. A principal defect of the final rule is DOE's arbitrary rejection of the tiered approach. How do we have authority for setting a deadline? It's been done in several other cases, as were mentioned in our brief, Your Honor, and we're in a situation here where the Department was roughly 11 years late getting out this rule and has generally shown it is unable to meet its obligations in carrying out this program without judicial oversight. DOE found that TSL 4 was thought that it was not economically viable at this point. Your claim is that it would be by 2013, therefore it's DOE's obligation to show that it couldn't be met by 2013. What's the authority for that? And does DOE have to discount the possibility that it would grant waivers in the future when it has a no backsliding provision? Well, that's a couple of questions. It was a couple of questions. Sorry. First off, the authority. Again, the statute requires the maximum technologically feasible standard that is economically justified. There is no mention in the statute of what year this standard must be implemented. And in the joint comment, the commenters submitted a very detailed explanation of why TSL 4 would be economically justified if implemented in 2013 and certainly would save more energy than the standards that DOE adopted. Now, State Farm and subsequent cases require the Department meaningfully consider and rationally respond to comments. And here we're in a situation where DOE rejected this proposal as not economically justified solely on the basis of the fact that it was not economically justified in 2010. That doesn't answer the question of whether or not it was economically justified in 2013 as the joint comment recommended. And, in fact, the joint comment used DOE's own spreadsheets to make the case that this proposal was economically justified. Let's suppose that DOE goes ahead and that we deny the petition. Does DOE have a continuing obligation to update this standard? So if we get to 2012 and it appears that TSL 4, through some breakthrough in technology, is now not only technologically feasible but the technology breakthrough makes it economically viable, does DOE have an ongoing obligation then to adopt TSL 4 for the year 2013? There is a provision in the statute that requires a review going forward. However, it's roughly about an eight-year forward. You would have the right under the APA to file a petition, wouldn't you? That's true, Your Honor, but in this case we're in a situation where DOE is, again, 11 years late in putting out this standard and without some sort of judicial oversight to force them to actually go back and look at this again. It's very doubtful that the Department would give any weight to that petition. And further, that's really not the issue before the Court. The issue before the Court is that DOE has to respond rationally to the comments it receives, and it did not do that here. It did not meet its obligations under EPCO or under the arbitrary and capricious standard. The other justification that DOE asserted for rejecting the joint proposal implied incorrectly that the proposal called for this technical conference, as you suggested, to roll back the 2013 standard. That's not what the joint proposal suggested. The proposal explained that the purpose of the conference was to assess the need for exception relief for manufacturers, not the need to roll back the entire standard. Congress has authorized DOE to grant exception relief to manufacturers. It's an individualized determination that's made on a case-by-case basis. DOE's misreading of the joint proposal to suggest that it was requiring this or seeking to implement a rollback only confirms that DOE hasn't meaningfully considered the joint proposal. The final rule is also arbitrary and capricious in that DOE's analysis of the economic justification for standards arbitrarily ignored or undervalued several of the economic benefits of stronger standards. First, DOE arbitrarily ignored the economic value of reductions in greenhouse gas emissions, carbon dioxide emissions. DOE did not consider the economic value of CO2 emissions, either quantitatively or qualitatively. DOE calculated only the physical mass of CO2 emissions that stronger standards would prevent, but the department refused to recognize any economic value or any economic benefit resulting from these reductions in emissions. And then DOE turned around and rejected stronger standards based on the fact they weren't economically justified. DOE's only justification for refusing to consider an economic benefit for CO2 emissions was that the precise economic value of CO2 is uncertain. However, DOE's assertion that the value of CO2 is uncertain is not supported by substantial evidence. In fact, DOE has done no analysis on this point, and it cannot pass its burden to stakeholders. And in fact, there is a large body of literature that DOE could have consulted on the economic benefit. What would converting the CO2 emissions to a financial figure have done? What does it go to? I struggled just a little bit as I read all the – to try and figure out what the significance of that is. I mean, they clearly found that there would be CO2 savings, but that was important. They just didn't convert it to a dollar figure. Does that all of a sudden make TSL-4 economically viable in 2013? Is that the argument? We're not arguing that the department has to put one specific dollar value on CO2 to include it in a total cost-benefit analysis of the rulemaking. We're saying that what the department's analysis did was fail to recognize that CO2 translates into some economic benefit. They're treating it as a separate environmental benefit. But when the purpose of the statute is to determine whether a standard is economically justified, when you're weighing economic factors and then separate environmental benefits, when you can actually be weighing them as economic factors. And does the NRDC and the Sierra Club have a – did you put a dollar figure on it? In our comments, we did not suggest a specific dollar figure for DOE to use. But, again, we're not saying DOE is compelled to do it that way. We think DOE could, in fact, come up with a specific dollar figure. But if they were to do a range of dollars. The savings on CO2 are not sort of internal to the electrical industry, I take it. These are sort of broad things. So it has to be assessed across a very, very broad base. Yes, the statute compels DOE to the maximum extent practicable to consider in determining whether standards are economically justified, the need of the nation to conserve energy. But if DOE were to come up with a figure, let's make something up, a billion dollars, if we're to say that there's a billion dollars in savings nationwide, how does it then work that into consideration of specific proposals that relate to transformers? Well, the department is charged with weighing seven factors under the statute to determine what standard level is economically justified. And it's not really before the court how DOE should go about that, specifically how it should weigh CO2 once it calculates some sort of economic value. But it's just the fact that DOE did not estimate any sort of economic value or a range of values or some sort of qualitative analysis of the economic benefits that would accompany CO2 reductions. So that's going a little bit further than we have to go. Right, but I gather that you're not arguing in this particular aspect of your presentation that it's, number one, the economic impact of the standard on the manufacturers you're talking about. You're talking about a more generic benefit. Now, what criteria does that fit under? It's the Roman numeral VI, the need for national energy conservation. And the department itself, in the preamble to the final rule, covered CO2 emissions in discussing the need for national energy conservation. If I could move on to the discounting of emissions, DOE further skewed its analysis against strong standards by applying a discount rate to the physical mass of CO2 emissions that stronger standards would avoid. This practice results in the nonsensical outcome that a ton of pollution today or that a ton of pollution in the future actually weighs less than a ton of pollution today. And several stakeholders explained in detail why this approach was irrational. DOE claims that it really didn't use that. Although it did the calculation, it didn't really use that in its final rule. How do you respond to that? DOE sought comment on that approach in the notice of proposed rulemaking, received a variety of comments from stakeholders, and then without any explanation or response to those comments, persisted in the final rule in including discounted emissions values. And it seems strange for the department to include something and specifically disavow its utility. The department's only cited justification was guidance from the Office of Management and Budget, which as demonstrated in California's brief does not actually compel discounting in this situation. Counsel, as I look at the record, I see in table Roman 6.21, which is at ER 40, where they've calculated the CO2 savings across all the various proposals, and then they've used the discount figures of 3 and 7, 3% and 7%. But it appears in the subsequent tables on 6.22 and 6.23 that they used the figures where they did not discount it. I think that was the government's point. I think that was so it appears that they used actual figures, not discounted figures, when they did that. So it's one thing to calculate it, and we can argue whether that was legitimate or not, but it appears that in practice they didn't incorporate it into the next table. Well, again, they included it in the preamble to the final rule, and it would be strange for the department to include something in the final rule that it's not going to include. There's all kinds of things that we can calculate, but it's not a criticism of them to say you calculated things that you then didn't use. Well, again, this was not an argument that was made in the final rule itself. It was something that was asserted in DOE's brief, but the final rule itself is not disavowed. At the end of the day, we have to decide whether the rule was arbitrary or capricious, and if somebody did a calculation, and the government's argument seems to be that they were doing it in response to monetization concerns and that didn't end up getting taken into consideration. So if it's irrelevant, how can we reverse the rule if it's not a predicate to the rule? Well, I continue to think that... You think it was, clearly, but they say not. It's hard to tell. Well, they say not as a post hoc rationale. Well, they do, but then, as Judge Bivey points out, the actual figures don't seem to include the discount rate. That's true, yes. I'm getting way over my time, so if there are other questions related to any of the other arguments that we raised in the brief, I'd be happy to answer those. Otherwise, we're good. Thank you. Thank you. Good morning, Your Honors. Megan Acevedo for the State of California. As Mr. Balow explained, Congress tasked DOE with setting efficiency standards that are at the highest level that are both technologically feasible and economically justified, and the consideration of the need to conserve energy has only become more important in light of climate change. As the U.S. Supreme Court stated in Massachusetts v. EPA, the harm associated with climate change are serious and well recognized, and the Court noted that they will not be resolved in one regulatory fell swoop. DOE declined to set the standards in this case at the highest available level, instead choosing a more polluting option. DOE's action violated NEPA because its EA did not provide for informed decision-making. Before you get into the substance of your argument on NEPA, would you address the waiver issue? Absolutely, Your Honor. Though DOE attempts to avoid this argument by this challenge by saying that we have not raised, that the issue is not sufficiently raised in the record, there are sufficient comments to have given DOE an opportunity to address this issue. I think the Great Basin Mine Watch decision that we cited in our reply speaks to this. NRDC commented in written comments that the U.S. is a signatory to the U.N. framework on climate change and is therefore obligated to heed the objective of stabilization of greenhouse gases at a level that will prevent dangerous climate change. But that's where the issue was preserved? That was in two comments from... I think that's a very, very general comment about the need to preserve the environment, which is something that we will all stipulate to. The claim here was that they failed to observe a U.S. law, not some general convention, that they failed to observe NEPA. That's a very, very specific claim. How does that preserve the claim? How should DOE have looked at that comment and then said, gosh, we have to conduct an EIS? Right. Well, we're actually not arguing in this instance that they necessarily had to perform an EIS, but they did need to put together a cumulative impacts analysis, and this in particular on climate change, which they recognized as being the major environmental issue. Did they use the words cumulative impact analysis? Not in their comments specifically, except that in the National Association of Regulatory Utility Commissioners, in their comments at NRDC's ER 489, they specified that DOE should consider the impacts associated with three of DOE's rules in tandem, citing specifically to an air conditioning rule that DOE was developing as well as a furnaces and boilers rule. Right. But nobody used the words EIS or EA or NEPA? They did not, Your Honor, in this instance. However, it's important to note, I think, also in this rulemaking, that as respondents have explained in their brief, that there is a tremendous amount of overlap between the environmental analysis here and the EPCA analysis. In fact, at their brief at 14, they point out that because the EA satisfied all the requirements of EPCA's analysis of the need for the nation to conserve energy, there was no need for them to do an EPCA-specific analysis. The same can apply here, that general comments came in. They didn't cite specifically to NEPA, which also was the case in Great Basin Mine Watch. One of the most relevant comments cited in that case, the decision specifically says, did not cite to the federal regulation at issue, but the issue itself was raised sufficiently to raise those claims. And in addition to the two comments I've noted, there were also numerous comments related to the discounting of physical emissions, which was presented in the EA itself in a table, a stand-alone table. And there, I think, you can see exactly why that information was as misleading as it was, in that it makes current emission, it treats emissions as if they're dollar figures and, therefore, need to be discounted. And anyone reading that EA, because everything in there is strictly just numbers, could look at that and think that the current value of future emissions is less than it actually is. You represent a huge client that's been at the forefront of change. You represent the other states. The NRDC and Sierra Clubs are very sophisticated, very knowledgeable, very, very good lawyers. And to say that nobody could utter the words NEPA or EIS or EA and cite a statutory provision to DOE and then come in and say, well, we didn't wait, but we preserved it, kind of beyond the pale, isn't it? No, Your Honor. I believe that in this rulemaking, the issues that were at the core of everyone's concerns, which were climate change, were raised by multiple commenters. And the fact that they didn't point to specific – But climate change is not sort of a – that's a roving commission. If that's all you have to do is say climate change and then everything in the U.S. Code becomes applicable to DOE. Well, I think even more important here is that DOE failed entirely to do a cumulative impacts analysis of any sort in that it never identified a single other relevant project. And, therefore, even without these comments before them, it was their obligation to recognize that other projects came into – needed to come into consideration in their evaluation of the cumulative impacts of this current project. DOE did not take that exercise, which is a very basic requirement under NEPA. And it was not required that someone bring that to their attention, as it was such an obvious – an obvious failing. And I would also add, Your Honor, that the Ilio Laucalani v. Rumsfeld case speaks to that so obvious standard. And I think that this is a perfect example of that, that where the main climate – the main impact recognized by DOE of the impacts here was the effects of this rule on greenhouse gas emissions. And they chose not to evaluate this in the context of climate change. It was an obligation that they should not have had to have been brought to their attention by the public. Okay. Thank you, counsel. We'll give you some time for rebuttal, though. Thank you, Your Honor. Okay. Please, the Court. I'm Thomas Byron from the Justice Department Civil Division here on behalf of the respondents, the Secretary of Energy and the Department of Energy. With me is Jennifer Scheller-Newman of the Environment Division at the Department of Justice. And we'll be splitting our time, as I indicated. Are you splitting your topics? I'm sorry, Your Honor? Are you splitting your topics? Yes, of course. I'm sorry. I will be addressing the topics raised under EPCA and the APA. And Ms. Newman will be addressing the issues under NEPA. Okay. Very good. Thank you. To begin, I'd like to emphasize that Congress in EPCA here established a complex, multi-factor system for determining whether and what standards to apply for energy conservation for appliances and equipment. Congress dictated in that statute that the regulatory agency should balance those factors and implement the scheme that Congress set out. In doing so, the agency necessarily must have a broad scope of discretion. And it exercised its discretion here over the course of an extensive rulemaking proceeding, beginning back in 1996, even with the process rule and the framework document that followed. So this is not the product of any political agenda or any particular administration. This is an ongoing and extensive inquiry into the technical details of what would satisfy the standards that Congress set out. I'd like to begin by emphasizing as well, as this Court asked at the outset, that a deadline for any action on remand would be wholly inappropriate here. The cases cited ---- So how long, how much time do you need if we remanded the case? Well, one of the problems, of course, is it's impossible to know that at the outset. But if I may turn to the justification that counsel offered, that there's a need for ongoing judicial supervision, counsel failed to point out that there is actually ongoing judicial supervision by this district court for the Southern District of New York in a case brought by, among others, these very Petitioners. They secured in that case a consent decree, which is ongoing. And as a matter of comity toward the district court in New York, this Court should not interfere with that. It's a consent decree related to a transformer rule? Related to transformer rules, among others. It sets out a schedule, a deadline, a schedule of deadlines, I should say, for the Department of Energy to issue its rulemaking decisions, its final rules on these and other energy conservation standards under APCA. I'd be happy to provide the Court with a copy of that consent decree if the Court would like. Mr. Leibman, but in light of what you're saying, how can you tell us that it's impossible to set deadlines when the Southern District of New York has? My point, Judge Thomas, is that it would be inappropriate, not that it's impossible, but that it would be — Is it more appropriate for them than us? Well, it would be inappropriate for two courts to try to undertake — No, no, I'm not — — potentially conflicting — I'm leaving aside that argument. I understand that.  So we have to take into account, of course, what the Southern District said. But you said we can't really predict and can't set a deadline. Well, the reason that — I said I couldn't predict. I'm sorry if I was unclear about that, Your Honor. But the reason is that there are enormous demands on the agency's resources as reflected in that consent decree and that litigation. And those demands must be balanced against any new obligation on remand. So that balancing must be done in the context of all of the agency's undertakings and obligations, not just this one. Right. That's why I asked you how long you needed. Well, again, I cannot make that assessment because I'm not privy to the various other demands that the agency faces. I represent the agency in this and a couple of other judicial review cases, but not their ongoing efforts to meet the deadlines. And that's an enormous undertaking. So turning then to the two-tier proposal, let's be clear about one thing first. It's not a consensus proposal. Consensus proposal is a term of art in the process rule, and it was established as a way of encouraging stakeholders to meet and try to come up with something that addressed the needs of all the relevant groups of stakeholders. This does not do that. It does not have the support of industry, of the manufacturing industry. I think the presence of the interveners makes that point on your side of the table. Certainly. But, I mean, the fact was that there were a number of stakeholders that got together that produced this proposal, correct? Yes. All right. Although not enough of them to constitute the kind of consensus that the agency would normally treat differently. Right. So you rejected it for two reasons, correct? That's right, Your Honor. So, first of all, it's clear that the, as the agency pointed out, there were already Let's start with the rollback reason. All right. The second reason, yes, Judge Thomas. Essentially, I know that's the second reason, but that's the one that was argued. Essentially, you said we can't do rollbacks and knock down that straw person. They said we never asked for rollbacks. And so the arguments sort of pass, I think, pass each other. I don't think they do entirely, Your Honor. As always in rulemaking proceedings, an agency's effort in many dozens of pages in the Federal Register is often not a model of clarity. But I think it's clear that the path can be discerned here. And the path that the agency had set out there is that DOE determined, and this actually is a Chevron issue, it determined that the statute precludes it from rollback. We, I think, I don't think Well, no, not just from rollback, Your Honor. Let me be clear about that, that the statute precludes it from doing what Petitioners asked, which is establishing a rule, a standard for 2013 that is not now economically justified, and then using the provision for exemptions that they relied on as a means of avoiding the rollback that would otherwise be required because it doesn't satisfy the statute. Now, let's clarify a couple of things. I mean, I think the statute by its plain terms actually probably supports that, although there's no need for the Court to reach that question. The statute actually says that if a standard is not economically justified, the agency is prohibited from adopting it. So it's not just that it must determine that it is economically justified, but that it is prohibited from doing so. That by itself is a sufficient answer.  I want to make sure I'm clear. Does that mean, then, that DOE cannot adopt a standard today that it believes is not economically feasible today, but will be by the time it becomes effective? Judge Bybee, DOE has not addressed that question. It hasn't addressed the question whether the statute precludes it from doing so. But in practice, the DOE has not done so and did not do so here. And its exercise of both Chevron interpretive policy What is an exercise of Chevron if you didn't interpret the statute? Well, the agency has interpreted the statute as a matter of practice in this rule and in others, Judge Thomas, to mean that it will not speculate about the possibility of economic justification in the future where economic justification has not been shown at the time of the final rule. That has been the agency's consistent practice. But I think the Supreme Court has just instructed that that's not the kind of interpretive decision that is due Chevron deference. I disagree, Judge Thomas. To which decision are you referring? I'm talking about the one last week. The name escapes me. Immigration. Is it Negussi from this Court? I thought that actually supported our position. Or is it another? Well, I'd be happy to look at those and submit a 20-page letter if the Court would like. Moving on. But, I mean, to get to the point, it's very difficult to defer to a practice that's not placed in writing, that doesn't interpret a statute. The idea of Chevron deference is that there's a gap in the statute. Yes. And the agency applies its expertise to fill in the gap. Yes. If you say we haven't interpreted the statute, but we've said this is our practice, that's a far different matter, isn't it? I'm not sure it is, Judge Thomas, but whether it's called Chevron deference or whether it's called the deferential review under the APA's arbitrary and capricious standard, which applies here by incorporation, of course, the result is the same. And under arbitrary and capricious review, there's no requirement, certainly, that the agency set out in the kind of detail that Petitioners now ask. But it has to address the issue. Well, I believe the agency did address the issue. Bear in mind a couple of things about this. This proposal came in after the close of comments. It came in while the agency was trying to scramble to compile everything in the administrative record, analyze it, and put its final rule into place by the deadline set forth in the consent decree I mentioned earlier. There wasn't a lot of time here. I believe it was February to September that was involved. And a lot of work had to be done. That's why comments were closed before that date. So you're too busy to address it? No, Your Honor. It was addressed. Let me be clear about that again. It was addressed. It wasn't addressed the way Petitioners now argue they would have preferred, but it was addressed, and that's what the APA requires. If I may turn to carbon dioxide, I think the Court pointed out that there's nothing in this administrative record that supports any particular valuation of CO2 emissions reductions, unlike the CAFE record at issue in CBD in which these very Petitioners, among others, submitted extensive data on that point. Nor is there anything, as Petitioners today have advanced for the first time, about the somewhat different issue about some economic characterization of that benefit short of monetization. The only reference in the record was a comment at the open hearing that is cited in their brief and in ours that said that the rates for power, for electric power, would actually be higher in the future than the agency had predicted because the commenter believed that some kind of cap-and-trade or other regulatory scheme would be imposed on carbon dioxide emissions. In other words, no unique carbon dioxide value, only an effect on rates. The agency properly addressed rates in its extensive modeling under NEMS that it borrowed from another agency within DOE, the EIA. So then turning to the discounted emission question, Judge Thomas, as you noted, this Court reviews the rule, not the record. And I believe actually that Petitioners ----  So why did you put it in? We put it in because OMB requires it, but that's of no moment. And I believe, in fact, Petitioners lacks standing to address this question since, in fact, they won. They put in comments that said the agency shouldn't rely on it. Now, the agency didn't rely on it. Now, they also put in comments that said the agency shouldn't even acknowledge that it's possible to do this thing. But that's not anything that causes them injury. And finally, note that the Petitioners' oral argument today doesn't address natural gas costs, employment levels, or core materials. So if the Court has no questions on those issues, we're happy to rest on our brief for that. Any further questions for the government? Thank you, Your Honor. For this branch of the government. Let's turn it over to your colleague. Good morning. Jennifer Newman, representing DOE, addressing the NEPA issues. You're with the Environmental Section? I am. Three out of four of the NEPA issues that the Petitioners raised in this case, as the Court has, I think, observed, were waived because they simply weren't presented to DOE in comments during the administrative process. But in any event, as we explained in our brief, DOE's environmental assessment here was adequate. So I'd like to begin by addressing the waiver issue. Neither the states, nor any of the other Petitioners, nor any of the commenters at all, told DOE that they thought an EIS should be prepared for this rulemaking. None of them said that DOE needed to do more cumulative impacts analysis for this rulemaking. And no one said that DOE needed to explain further the environmental effects of the reductions in CO2 emissions that would be a result of this rule. And without that sort of contention being put before the agency, Petitioners simply cannot come into court and try to assert these claims now. They should not be addressed by this Court. I don't quite understand that. If it's quite obvious to the Department of Energy that they must have a NEPA statement or an EIS or an EA, can they just brush that aside unless somebody complains? No, that's not the case, Your Honor. As this Court's case law says – No, what you're saying is that once the DOE has made its decision that it should not have an EIS or an EA, then they don't have to continue the process unless somebody complains. Essentially, yes. I believe that the words that this Court has used and the Supreme Court has used is sometimes there could be flaws in an environmental assessment that are so obvious that the agency hasn't met its basic burden to comply with NEPA. And in such a case, it would be appropriate to allow Petitioners or plaintiffs to come in and challenge an agency decision on those grounds. However, that's not the case here. The flaws in this EA are not so obvious that it would allow these Petitioners to come in and raise these claims without having made the – So the waiver issue applies when it's not that obvious. If it's not that obvious, no one complains, then you treat it as a waiver and you move on. That's right. So why isn't – why aren't cumulative impacts one of those kinds of issues that might be considered obvious? With respect to the cumulative impacts, it's not as if DOE didn't do any cumulative impacts analysis at all. They did look at things like, for example, the effects of the rule on coal mining and what effect that would have on cumulative carbon dioxide emissions. They did do that sort of analysis. They just didn't do the analysis that the Petitioners now want, which is looking at other DOE rules that might have an impact on carbon dioxide. And here, as we explained, that was also reasonable for DOE not to look at that because the rules the Petitioners are talking about could only further reduce carbon dioxide emissions and therefore increase the beneficial impacts of the agency's rule in this – that's under review in this case. Does your theory on waiver only go to an EIS or does it go to an EA too? It goes to an EA in a case like this, certainly, where the agency publishes the EA and it is available to the public for comments. That doesn't happen in every single case, but it certainly happened here. These Petitioners had the opportunity to view the entire environmental assessment and make comments on it if they felt the DOE was unjustified in relying on the environmental assessment that it had prepared. And so certainly in this case, it applies in the situation of an EA. I'd like to – Before you go on, getting back to your first point, that it's obvious that these other rules are designed to reduce emissions, therefore one not need to consider those. It's a good point. I don't find it in the agency analysis. Is that true? No. It's not in the agency analysis, and I think the reason is because nobody brought it to the agency's attention.  That isn't the one we reviewed. But it should be considered. I mean, that's the difficulty, and you find yourself in this position in many cases where you have an explanation, but the agency didn't give it, which makes it very hard for us to analyze. That's right. But I think in this case, this Court doesn't need to get there because that was never an issue that was brought to the agency's attention. And if it had been, then the agency could have had an opportunity to provide the analysis. Just briefly on the discounted emissions problem, there's nothing in NEPA that prevents the agency from providing additional information here. And Petitioners haven't cited any cases that say that the provision of additional information is a violation of NEPA. Here, the agency relied on exactly the information that the Petitioners were asking it to look at, and there's no possibility of confusion from the E.A. Unless the Court has further questions, I'd like to allow Mr. Silcox. I think the confusion on that issue comes in the fact that it seemed to be of great importance to the agency before the final rule, and then the tables put in the final rule, but doesn't apparently relied on. You kind of have to reason that out by looking at the figures. But how do you defend the initial analysis that one ought to discount pollution effects? As DOE said in its final rule, it was including those figures because OMB wanted those figures to be included. DOE didn't rely on them. I don't know. I understand that, but I gather you're not defending the analysis. I don't know that there's any reason to defend the analysis since the agency didn't rely on it. It wasn't part of the agency's rationale in promulgating the rule that somehow the emissions benefits from the rule were being discounted into the future. Okay. Thank you. Thank you, Counsel. May it please the Court. I'll put four minutes on the clock. I want to make sure you're not cheated. Thank you very much, Judge Thomas. May it please the Court. I am Clark Silcox, General Counsel of the National Electrical Manufacturers Association. We represent the companies both very large and very small in this particular transformer industry who are already starting to make and will be making these significantly more efficient distribution transformers as required by DOE's rule that becomes effective this January 1st. I want to spend my brief amount of time today explaining what I think in real-world terms is why the DOE's rule is not arbitrary or capricious. I have no doubt DOE established a very, very robust efficiency standard in this case for transformers. They've documented that, I think. But I can assure you, had DOE gone higher, I would probably be your petitioner here today rather than aligned with the respondent. This is a standard that's much higher than NEMA and the manufacturers advocated for during the course of the rulemaking. And quite frankly, many manufacturers were stunned that in connection with liquid transformers, DOE selected TSL, Trial Standard Level C, in the final rule. In the final rule, DOE observed this, that a large number of stakeholders were asking DOE to select Trial Standard Level Number 4. And the reason for that was that it minimized lifecycle costs for liquid transformer customers, primarily utilities. Those stakeholders included the state of California, the state of New York, Massachusetts, the American Council for an Energy-Efficient Economy, numerous, numerous utilities. DOE noted that in the final rule it did give substantial, although not exclusive, weight to minimizing lifecycle costs. But it also noted that there was a problem with TSL-4 and TSL-3 and that there were burdens associated with them. First, there were inconsistent efficiency values in the tables for TSL-4 and TSL-3 as between single-phase transformers and three-phase transformers. And that was a burden for both, or would create burdens for both customers and manufacturers. And then there were certain voltages of transformer designs that could not be made with silicon steels, forcing manufacturers with those particular designs to use an amorphous core material that was in extremely short supply and was not available to the industry to meet the demand for those kinds of transformers. So DOE said, we need to fix this problem. It's a real problem. And so they came up with new designs, excuse me, TSLs A, B, C, and D. Now, TSL-A did generate the most significant energy savings and it would have reduced CO2 emissions, you know, quite significantly as well. However, DOE recognized numerous burdens with those, including that it didn't minimize, in fact, it had caused the largest net increase in lifecycle costs for the utilities. The TSL-B, TSL-C, if you look at the table, they're pretty close together. Both minimize lifecycle costs to the same extent. TSL-B, however, had a longer payback period for the customers, for the utilities, which means that it would take them longer to recover their investment compared to TSL-C. Additionally, TSL-B forced manufacturers to use only the thinnest silicon steel called M2, seven mils thick, or the amorphous core material, both of which were in short supply. On the other hand, TSL-B, on the benefit side of the equation, would generate 0.14 quads of additional energy savings over 30 years, about 5% more. And it would reduce carbon dioxide emissions by about 5% over 30 years. So the impact on employment between TSL and TSL-B and C was not significant. They were basically the same. So here's their weighing that's going on. They see these benefits and they see the burdens. This is rational decision-making that DOE engaged in. This is exactly the kind of judgment that is committed to the expert agency that Congress is assigned for dealing with this issue. It's not arbitrary and capricious to weigh these burdens and benefits in the manner that DOE did under EPCA. This is a great standard for energy savings. This is a great standard for reducing carbon dioxide emissions. For manufacturers, they're making a significant investment in new equipment to deal with this standard. It wasn't what they were expecting to have to deal with, but they are. And the utilities, on the other hand, benefit because transformer lifecycle costs are minimized and they have the best possible payback period. So this is good for the country, good for a lot of different industrial groups, and I ask the Court to sustain the DOE rule and deny the petitions. Let me ask you a question about some of the difficulties of this two-chair approach. It seems like one of the problems that is raised with the two-chair approach is the first chair, nine years, has a requirement, and then there's a second requirement at 13. But if I understand correctly, you have an early starting of the machinery that's going to be used, and the difficulty was that that machinery that was for 2009 had already been in process. How much of that is a problem? That is, is it a substantial financial problem or not? I couldn't get from the briefs. I understood the argument, but I couldn't understand the nature of it. Perhaps from your representation you could help. I'm pleased to answer that question, Your Honor. The transformers are, by and large, a custom product. Different utilities have different requirements. And so as you saw in our brief, we tried to explain that there's a tradeoff between whether you try to generate certain efficiencies through the core materials that you use or in the windings, the copper and aluminum windings. And so for every customer, there's a peculiar design to meet their needs. Some of it is addressed by the geometry. For example, you can't have a, I call them cans, but you can't have a transformer can that's too large or too heavy because of the nature of the poles that the particular utility has. So I think what was in the works for 2009 was a lot of already committed design work for particular customers when they said, we need for delivery and such and such a date out there. So there was work in process that was already undertaken. And for some of those customers, if they had had a 2009 effective date, the companies would have been delivering a noncompliant product. That was the problem for 2009. It was already work in process both on the manufacturing side as well as the design side that would have said we won't be able to make our contractual requirements to the utilities because our transformers won't meet the requirements of the rule. So we said we need that additional year. This was NEMA's comment to the DOE. We needed it to be 2010. So 2009 was a problem. Okay. Thank you. Thank you, Yasin. Thank you. Four minutes. Put four on the clock. Thank you, Your Honors. I'd just like to make a few points regarding NEPA, again, based on respondents' statements. First, here NEPA, I'm sorry, DOE did not perform a cumulative impacts analysis at all in terms of NEPA's requirements. There was not another project of any sort considered under this rulemaking. They did not look in their EA at any of their own rules or at any rules that might touch on the electricity sector's emissions, anything of that sort. Therefore, if you look at the requirements under the clear language of the NEPA regulations themselves, you don't find that this EA complies with those. In addition, as the Center for Biological Diversity versus NHTSA court made very clear, this climate change analysis is exactly the type of cumulative analysis that's required, especially in a rule like this one that impacts the emissions of greenhouse gases. In addition, considering other rulemakings would have been entirely appropriate because, again, in the Center for Biological Diversity versus NHTSA, that court sent back the rule and had them look at other rulemakings under which NHTSA was working on for almost identical failings in that environmental assessment. And this efficiency standard, contrary to what was argued in the briefs, I'm sorry, in respondents' briefs, will not necessarily bring about an environmental benefit. It may bring – it will be an improvement over the status quo in terms of regulations in that there will be limitations that weren't there before. However, an improvement over the regulatory status quo does not mean that this will necessarily amount to preservation of the current environment, which is exactly what the cases that were cited by respondents in their briefs dealt with, such as Douglas County versus Babbitt, which do not require NEPA analysis where there's preservation of the current environment. And instead of doing the required cumulative impacts analysis, DOE looked only at this rule in isolation and at how that rule would be affected by high and low economic growth scenarios. That is – under no reading of NEPA does that comply with the cumulative impacts analysis. Thank you, Your Honors. One point that DOE made was that the tiered approach came up after the close of the comment period. That's not, I believe, accurate. On page 578 of the Environmental Petitioner's Excerpt of the Record is a comment from the Edison Electric Institute that actually advocates a tiered approach to standards. This came up during the initial comment period on the Notice of Proposed Rulemaking. Was it something that they just proposed that there could be a two-tier, but it wasn't the actual proposal from sort of the consortium? That's true. So DOJ is correct that the actual proposal from the consortium came in after the close of the comment period, although somebody else had said, gosh, we could do a two-tier approach, and that would be a good way of doing this. Well, the actual proposal came in during a supplemental Notice of Proposed Rulemaking to reopen the comment period for additional comment on a few issues, and that's when the main tiered approach came in, and then there was additional support for the tiered proposal that was submitted later. One other point that came up was on OMB requiring discounting of emissions. Again, it says, and this is in page 320 of the State Petitioner's Excerpts of Record OMB guidance document, it may be possible in some cases to avoid discounting non-monetized benefits. And so it does not appear that OMB actually requires that to happen. One other point, Dewey touched on the joint comment being not a consensus proposal. Again, this was an agreement reached between efficiency advocates, the electric utility industry groups, Edison Electric Institute, which represents investor-owned utilities, and the American Public Power Association, which represents public municipal-type utilities. And actually the largest manufacturer of transformers endorsed this proposal as well. So this wasn't a one-sided agreement by any means. On the value of carbon dioxide emissions, as NRDC noted in the comment period, the value of CO2 needs to be taken into account that Dewey calculated these physical emissions, but the result wouldn't be any different if it had just ignored them entirely. And I'm out of time, so unless the Court has further questions. Thank you. Thank you all for your arguments. There's never enough time for this kind of case, it seems like, but I think you've all done a great job of expressing your key points in a very succinct way. And I thank you for your briefing as well. And with that, we'll be in the adjournment.
judges: Wallace, Thomas, Bybee